Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Yun Lu*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YUN LU, derivatively on behalf of WEBTOON ENTERTAINMENT, INC.<br><br>Plaintiff,<br><br>v.<br><br>JUNKOO KIM, DAVID J. LEE, NANCY DUBUC, NAMSUN KIM, HAEJIN LEE, JUN MASUDA, and ISABELLE WINKLES,<br><br>Defendants,<br><br>and<br><br>WEBTOON ENTERTAINMENT, INC.,<br><br>Nominal Defendant. | Case No. 2:26-cv-9343<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Yun Lu ("Plaintiff"), by and through Plaintiff's undersigned counsel, brings this derivative complaint for the benefit of nominal defendant Webtoon Entertainment Inc. ("Webtoon" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanage, waste of corporate assets and for violations of federal law, including for contribution under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Securities Exchange Act (the "Exchange Act").

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, including a review of publicly available information, including filings by Webtoon with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including *Brookman v. Webtoon Ent. Inc., et al.,* Case No. 2:24-cv-07553-CBM-RAO (C.D. Cal.), and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Webtoon in order to remedy violations of state and federal law committed by the Individual Defendants from, at least, June 27, 2024 through the present (the "Relevant Period") and that have caused substantial harm to the Company.

2. Webtoon was founded in 2005 by Defendant Junkoo Kim and is a majority-owned subsidiary of the South Korean internet conglomerate, NAVER Corporation ("NAVER.").

3. Webtoon represents itself to be "a global storytelling platform where a vibrant community of creators and users discover, create and share new content." The Company focuses on, *inter alia*, mobile webcomics and visual storytelling.

4. On June 27, 2024, Webtoon filed its prospectus on Form 424B4 (the "Prospectus") with the SEC in connection with its initial public offering (the "IPO"), which formed part of its registration statement (collectively, the "Registration Statement"). In its IPO, Webtoon sold 16,371,549 shares of common stock at a price of $21.00 per share for net proceeds of approximately $308.5 million. According to the Company, these IPO proceeds were to be used for general corporate purposes, including capital expenditures, operating expenses, and working capital.

5. Defendants failed to disclose in the Registration Statement, among other things, that the Company had experienced a deceleration in advertising revenue growth and IP adaptations revenue. Resultingly, Defendants' rosy representations about the Company's business, operations, and prospects materially false and misleading.

6. On August 8, 2024, after the market closed, the truth emerged when the Company disclosed its financial results for the second quarter of 2024, which had ended just days after the closing of the IPO. Webtoon disclosed revenue of $321 million, representing total revenue growth of only 0.1%, and reported a quarterly net loss of $76.6 million, or 70 cents. Further, Webtoon disclosed that advertising revenue declined 3.6% and IP adaptations revenue declined 3.7%. Webtoon stated, in discussing these results, that its revenue and revenue growth had been "offset by the Company's significant exposure to weaker foreign currencies."

7. On this news, the Company's stock price plummeted $7.88 per share, or 38.2%, from a closing price of $20.63 per share on August 8, 2024 to close at a price of $12.75 per share on August 9, 2024.

8. Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to a series of materially false and misleading statements to investors regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Webtoon had undergone a deceleration in advertising revenue growth; (2) Webtoon had undergone a deceleration in IP adaptations revenue; and (3) Webtoon faced exposure to weaker foreign currencies which offset revenue growth. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9. The Individual Defendants also breached their fiduciary duties during the Relevant Period by (1) failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact; and (2) causing the Company to fail to maintain adequate internal controls.

10. As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

11. As a direct and proximate result of the Individual Defendants' knowingly or highly reckless breaches of fiduciary duty and other misconduct, the Company has suffered substantial harm and financial damage and has further subjected the Company to need to undertake internal investigations and to implement adequate internal controls, as well as caused losses from the waste of corporate assets and losses due to the unjust enrichment of the Individual

Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein.

12. On December 11, 2024, Plaintiff, through Plaintiff's counsel, served a demand (the "Demand") on Webtoon's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing Webtoon to issue improper statements set forth herein. On January 24, 2025, Plaintiff's counsel received a letter of behalf of the Board (the "Refusal Letter") indicating that the Board had determined "to defer a decision on whether to conduct the demanded investigation or to initiate litigation" pending related pending litigation, including the Securities Class Action.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27(a) of the Exchange Act because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Webtoon is headquartered in this District.

## PARTIES

17. ***Plaintiff*** is, and has been at all relevant times, a continuous shareholder of Webtoon.

18. ***Nominal Defendant Webtoon*** is a Delaware corporation with its headquarters at 222 N. Pacific Coast Highway, Suite 2300, El Segundo, CA 90245. Webtoon's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "WBTN."

19. ***Defendant Junkoo Kim*** ("J. Kim") founded Webtoon and has served as the Company's CEO and Chairman of the Board since September 2016. He also serves as Chair of the Nominating and Corporate Governance Committee. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 23, 2025 (the "2025 Proxy"), Defendant J. Kim received $44,095,031 in total compensation from the Company in 2024. Defendant J. Kim is named as a defendant in the Securities Class Action.

20. ***Defendant David Lee*** ("D. Lee") has served as the Company's CFO and as a Company director since April 2024. He previously served as Chief Operating Officer from November 2023 to April 2026. According to the 2025 Proxy Statement, Defendant D. Lee received $6,132,051 in total compensation from the Company in 2024. Defendant D. Lee is named as a defendant in the Securities Class Action.

21. ***Defendant Nancy Dubuc*** ("Dubuc") has served as a Company director since May 2024. Defendant Dubuc also serves as a member of the Audit Committee and Compensation Committee. Defendant Dubuc is named as a defendant in the Securities Class Action. According to the 2025 Proxy Statement, Defendant Dubuc received $510,103 in total compensation from the Company in 2024.

22. ***Defendant Namsun Kim*** ("N. Kim") has served as a Company director since May 2024. He also serves as a member of the Audit Committee,

Compensation Committee, and Nominating and Corporate Governance Committee. He served as Webtoon's CFO from March 2022 to October 2023. Defendant N. Kim is named as a defendant in the Securities Class Action.

23. ***Defendant Haejin Lee*** ("H. Lee") has served as a Company director since October 2020. He also serves as the Chair of the Compensation Committee. Defendant H. Lee is named as a defendant in the Securities Class Action.

24. ***Defendant Jun Masuda*** ("Masuda") has served as a Company director since October 2020. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Masuda is named as a defendant in the Securities Class Action.

25. ***Defendant Isabelle Winkles*** ("Winkles") has served as a Company director since April 2024. She also serves as Chair of the Audit Committee. According to the 2025 Proxy Statement, Defendant Winkled received $517,569 in total compensation from the Company in 2024. Defendant Winkles is named as a defendant in the Securities Class Action.

26. Defendants J. Kim, D. Lee, Dubuc, N. Kim, H. Lee, Masuda, and Winkles are collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

27. By reason of their positions as officers, directors, and/or fiduciaries of Webtoon and because of their ability to control the business and corporate affairs of Webtoon, the Individual Defendants owed Webtoon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Webtoon in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Webtoon and its shareholders so as to benefit all shareholders equally.

28. Each director and officer of the Company owes to Webtoon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

29. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Webtoon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30. To discharge their duties, the officers and directors of Webtoon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

31. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Webtoon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

32. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful

information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's Class A common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

33. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Webtoon were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Webtoon's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Webtoon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Webtoon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Webtoon's operations would comply with all applicable laws and Webtoon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

34. Each of the Individual Defendants further owed to Webtoon and the shareholders the duty of loyalty requiring that each favor Webtoon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

35. At all times relevant hereto, the Individual Defendants were the agents of each other and of Webtoon and were at all times acting within the course and scope of such agency.

36. Because of their advisory, executive, managerial, directorial, and controlling positions with Webtoon, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

37. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Webtoon.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

38. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

40. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully

or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Webtoon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

42. At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Webtoon and was at all times acting within the course and scope of such agency.

## WEBTOON'S CODE OF CONDUCT

43. Webtoon's Code of Ethics (the "Code of Conduct") states that "[a]ll directors, officers and employees are required to be familiar with the Code, comply with its provisions and report any suspected violations as described below."

44. The Code of Conduct states, with respect to its adoption:

> The Board of Directors (the "Board") of WEBTOON Entertainment Inc. (together with its subsidiaries, the "Company") has adopted this Code of Ethics (the "Code") in order to deter wrongdoing and promote: 1. honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; 2. full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or

> submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company; 3. compliance with applicable governmental laws, rules and regulations; 4. protection of the Company assets, including corporate opportunities and confidential information; 5. fair dealing practices; 6. the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and 7. accountability for adherence to the Code.

45. In a section titled Honest and Ethical Conduct, the Code of Conduct states:

> The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically. Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in their dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom they have contact in the course of performing their job.

46. In a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

> A conflict of interest occurs when an individual's private interest (or the interests of a member of their family) interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of interest can arise when an employee, officer or director (or a member of their family) takes actions or has interests that may make it difficult to perform their work for the Company objectively and effectively. Conflicts of interest also arise when an employee, officer or director (or a member of their family) receives improper personal benefits as a result of their position in the Company.
>
> ***
>
> Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest should be avoided unless specifically authorized as described in the paragraph below.

47. In a section titled "Corporate Opportunities," the Code of Conduct states, in relevant part:

> All directors, officers and employees owe a duty to the Company to advance its interests when the opportunity to do so arises. Directors, officers and employees are prohibited from taking for themselves personally opportunities that are discovered through the use of Company property, information or position. Directors, officers and employees may not use Company property, information or position for personal gain. In addition, no director, officer or employee may compete with the Company.

48. In a section titled "Confidentiality," the Code of Conduct states, in relevant part:

> Directors, officers and employees should maintain the confidentiality of information entrusted to them by the Company or by its customers or partners, except when disclosure is authorized or legally mandated or, in certain circumstances, permitted by law. Confidential information includes all non-public information that might be of use to the Company's competitors, or harmful to the Company or its customers or partners if disclosed.

49. In a section titled "Fair Dealing," the Code of Conduct states, in relevant part:

> Each director, officer and employee must deal fairly with the Company's customers, suppliers, competitors, partners, service providers, employees and anyone else with whom they have contact in the course of performing their job. No director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of facts or any other unfair dealing practice.

50. In a section titled "Disclosure," the Code of Conduct states, in relevant part:

> The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules. Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained.

> Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

51. In a section titled "Compliance," the Code of Conduct states, in relevant part:

> Directors, officers and employees should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates. Although not all directors, officers and employees are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Questions about compliance should be addressed to the Legal Department. Insider trading is unethical, illegal and a violation of the Company's Insider Trading Policy.

52. In a section titled "Waivers," the Code of Conduct states:

> The Board (in the case of a violation by a director or executive officer) or the General Counsel (in the case of a violation by any other person) may, in its discretion, waive any violation of this Code.
>
> Any waiver for a director or an executive officer shall be disclosed as required by SEC and NASDAQ rules.

53. In a section titled "Enforcement," the Code of Conduct states:

> The Company must ensure prompt and consistent action against violations of this Code. If, after investigating a report of an alleged prohibited action by a director or executive officer, the Audit Committee determines that a violation of this Code has occurred, the Audit Committee will report such determination to the Board. If, after investigating a report of an alleged prohibited action by any other person, the relevant supervisor determines that a violation of this Code has occurred, the supervisor will report such determination to the General Counsel. Upon receipt of a determination that there has been a violation of this Code, the Board or the General Counsel will take such preventative or disciplinary action as it deems appropriate, including, but not limited to, reassignment, demotion, dismissal and, in the event of criminal conduct or other serious violations of the law, notification of appropriate governmental authorities.

54. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of federal law.

## WEBTOON'S CORPORATE GOVERNANCE GUIDELINES

55. Webtoon also maintains Corporate Governance Guidelines (the "Governance Guidelines"). In a section titled "Purpose," the Governance Guidelines state:

> The board of directors (the "Board") of WEBTOON Entertainment Inc. (the "Company") has adopted these Corporate Governance Guidelines (these "Guidelines") as a general framework to assist the Board in carrying out its responsibility for the business and affairs of the Company to be managed by or under the direction of the Board. The Board's principal responsibility is one of oversight. Management of the Company is responsible for implementing the Company's strategic plan; identifying and managing risk; making and keeping the books and records of the Company; preparing the Company's financial statements and determining that they are complete, accurate, and in accordance with generally accepted accounting principles; establishing satisfactory disclosure controls and internal control over financial reporting; and timely reporting to the Board. The independent auditor is responsible for auditing the Company's financial statements and the effectiveness of the Company's internal control over financial reporting. The Company's internal and outside counsel are responsible for assuring compliance with laws and regulations and the Company's corporate governance policies.

56. In a section titled "Board Duties and Responsibilities," the Governance Guidelines state:

> A director is expected to discharge such director's duties, including duties as a member of a committee on which the director serves, in

good faith and in a manner the director reasonably believes to be in the best interests of the Company. The authority and responsibilities of the Board will include:

1. Strategic Plan: To set the direction of the Company and monitor management to ensure that the Company achieves its objectives; and to review, monitor and approve the overall operating, financial and strategic plans, operating goals and performance of the Company.

2. Reporting and Compliance Systems. To ensure that Company management maintains an effective system for timely reporting to the Board or appropriate Board committees and to the public as required on the following: (1) the Company's financial and business plans, strategies and objectives; (2) the financial results and condition of the Company and its business segments; (3) significant accounting, regulatory, competitive, litigation and other issues affecting the Company; and (4) systems of control which promote accurate and timely reporting of financial information to stockholders and compliance with laws and corporate policies.

3. Risk Oversight. To understand the principal risks associated with the Company's business on an ongoing basis, and oversee the key risk decisions of management, which includes comprehending the appropriate balance between risks and rewards.

4. Disclose Relationships. To disclose promptly to the Board any existing or proposed relationships with the Company (other than service as a Board member or on Board committees) which could be required to be disclosed or could affect the independence of the director under applicable listing standards, including direct relationships between the Company and the director and the director's family members, and indirect relationships between the Company and any business, nonprofit or other organization in which the director is a general partner or manager, officer, or significant stockholder, or is materially financially interested.

5. Stockholder Engagement: To ensure that the Company maintains an active dialogue with stockholders so that their perspectives are thoughtfully considered; and to review stockholder proposals properly submitted and, based on the

recommendations of the Nominating and Corporate Governance Committee, respond as appropriate.

6. Annual Stockholders' Meeting: To attend the Company's annual stockholders' meeting unless unusual circumstances make attendance impractical.

7. Corporate Culture: To devise and maintain a human capital management system and a corporate culture that promote compliance with legal and regulatory requirements and the ethical conduct of the Company's business.

8. Sustainability: To promote the long-term sustainable growth of the Company, including considering the social and environmental goals of the Company.

9. Compensation: To select, evaluate, and compensate the Company's CEO and other executive officers and to approve the compensation of directors, based on the recommendations of the Compensation Committee.

10. Management Succession Planning. To approve, based on the recommendations of the Nominating and Corporate Governance Committee, a CEO succession plan.

11. Board Evaluation. To review the results of the annual board evaluation conducted by the Nominating and Corporate Governance Committee to determine whether the Board and its committees are functioning effectively.

12. Corporate Governance Documents: To review and approve any amendments to the Company's certificate of incorporation, bylaws, code of ethics, these corporate governance guidelines, and other corporate governance policies, based on the recommendations of the Nominating and Corporate Governance Committee.

57. In violation of the Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to

breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of federal law. Also, in violation of the Governance Guidelines, the Individual Defendants failed to maintain the accuracy of Webtoon's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**<u>WEBTOON'S AUDIT COMMITTEE CHARTER</u>**

58. Webtoon also maintains an Audit Committee Charter. With respect to the purpose of the Audit Committee, Webtoon's Audit Committee Charter states:

> The purpose of the Audit Committee (the "Audit Committee") is to oversee the accounting and financial reporting processes of WEBTOON Entertainment Inc. (the "Company") and the audits of the Company's financial statements. In fulfilling its purpose, the Audit Committee is responsible for maintaining free and open communication between itself and the independent auditor, internal auditor function and management of the Company, and for determining that all parties are aware of their responsibilities.
>
> The Audit Committee's principal responsibility is one of oversight. Management of the Company is responsible for preparing the Company's financial statements, determining that they are complete, accurate, and in accordance with U.S. generally accepted accounting principles ("GAAP") and establishing satisfactory disclosure controls and internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and the effectiveness of the Company's internal control over financial reporting. The Company's internal and outside counsel are responsible for assuring compliance with laws and regulations and the Company's corporate governance policies.

59. With respect to audit services and problems and the Audit Committee's duties and responsibilities related thereto, the Audit Committee Charter states:

1. Auditor Appointment: To (1) appoint, retain or replace an independent registered public accounting firm to act as the Company's independent auditor for the purpose of auditing the Company's annual financial statements, books, records, accounts and internal controls over financial reporting or performing other audit, review or attest services for the Company; (2) set the compensation of the Company's independent auditor; (3) approve all audit engagement fees and terms; (4) oversee the work done by the Company's independent auditor; and (5) terminate the Company's independent auditor, if necessary. The independent auditor shall report directly to the Audit Committee.

2. Pre-Approval: To pre-approve all audit and permitted non-audit and tax services that may be provided by the Company's independent auditor, and establish policies and procedures for the Audit Committee's pre-approval of permitted services in compliance with applicable SEC rules and review such pre-approval policies at least quarterly.

3. Audit: To review and discuss with the Company's independent auditor (1) the auditor's responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process; (2) the overall audit strategy, planning and staffing; (3) the scope and timing of the annual audit; (4) any significant risks identified during the independent auditor's risk assessment procedures; and (5) when completed, the results, including significant findings, of the annual audit.

4. Audit Problems: To review and discuss with the Company's independent auditor and management (1) any audit problems or difficulties, including difficulties encountered by the Company's independent auditor or internal audit department during their audit work (such as restrictions on the scope of their activities or their access of information); (2) any significant disagreements with management; and (3) management's response to these problems, difficulties or disagreements; and to resolve any disagreements between the Company's independent auditor or internal audit department and management.

5. Critical Audit Matters: To engage in a dialogue with the independent auditor to understand the nature of each identified

> critical audit matter, the auditor's basis for identifying a matter as a critical audit matter and how each such identified matter will be described in the auditor's report.
>
> 6. Internal Audit: To review, discuss with the Company's independent auditor, and approve the functions of the Company's internal audit department, including its purpose, authority, organization, responsibilities, budget and staffing; and to review the scope and performance of the department's internal audit plan, including the results of any internal audits, any reports to management and management's response to those reports or internal audit department; and to review and approve the hiring, dismissal, evaluation and compensation of the senior employee in charge of the internal audit function.

60. With respect to internal controls and risk oversight and the Audit Committee's duties and responsibilities related thereto, the Audit Committee Charter states:

> 7. Internal Controls: To review with management, internal audit, and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditor disclosure relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K (the "Form 10-K" ) or quarterly report on Form 10-Q (the "Form 10-Q"), as applicable.
>
> 8. Risk Oversight: To review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the

> Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.

61. With respect to the Company's financial results, financial statements, and earnings releases and the duties and responsibilities of the Audit Committee related thereto, the Audit Committee Charter states:

> 9. Annual Financials: To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's Form 10-K before the Form 10-K is filed. The Audit Committee shall recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.
>
> 10. Quarterly Financials: To review and discuss with the Company's independent auditor and management the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's Form 10-Q before the Form 10-Q is filed.
>
> 11. Earnings Releases: To review and discuss with management and the Company's independent auditor: (1) the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information; and (2) any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.
>
> 12. Financial Statements Issues: To review with management and

> the Company's independent auditor: (1) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (2) analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements; (4) consideration of the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles; and (5) the completeness and clarity of the disclosures in the financial statements.

62. The Audit Committee Charter also lists the following duties and responsibilities of the Audit Committee, in relevant part:

> 20. Code of Ethics: To monitor compliance with the Company's Code of Ethics (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code.
>
> 21. Related Party Transactions: To (1) review, approve and oversee any transaction between the Company and any related person (as defined in Item 404 of Regulation S-K) on an ongoing basis, in accordance with Company policies and procedures, including the Company's Related Party Transactions Policy; (2) keep the Company's independent auditor informed of the Audit Committee's understanding of the Company's relationships and transactions with related parties that are significant to the Company and whether any member of the Audit Committee has concerns regarding relationships or transactions with related persons and, if so, the substance of those concerns; and (3) review and discuss with the Company's independent auditor the independent auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.
>
> 22. Legal Compliance: To (1) review, with the General Counsel

> and outside legal counsel, legal and regulatory matters relating to the Company and its subsidiaries that could have a significant impact on the Company's financial statements; (2) review the Company's compliance with applicable laws and regulations; and (3) review and oversee the Company's policies, procedures and programs designed to promote and monitor legal and regulatory compliance and sustainability.
>
> ***
>
> 25. Audit Committee Performance Evaluation: To conduct an annual evaluation of the performance of its duties under this Charter and present the results of the evaluation to the Board. The Audit Committee shall conduct this evaluation in such manner as it deems appropriate.
>
> 26. Audit Committee Charter Review: To review this Charter at least annually and recommend any proposed changes to the Board for approval.

63. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of federal law. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## SUBSTANTIVE ALLEGATIONS

***Background***

64. Webtoon was founded in 2005 by Defendant J. Kim and represents itself to be "a global storytelling platform where a vibrant community of creators and users discover, create and share new content." The Company focuses on, *inter alia*, mobile webcomics and visual storytelling.

65. Webtoon is a majority-owned subsidiary of the South Korean internet conglomerate, NAVER Corporation ("NAVER").

***False and Misleading Statements in the Registration Statement and Prospectus***

66. On May 31, 2024, Webtoon filed its registration statement on Form S-1 with the SEC, which forms part of the Registration Statement.

67. On June 17, 2024, Webtoon filed its final amendment to the registration statement with the SEC on Form S-1/A, which forms part of the Registration Statement.

68. On June 18, 2024, the Registration Statement was declared effective.

69. On June 27, 2024, Webtoon filed the Prospectus with the SEC, which forms part of the Registration Statement. The Registration Statement was signed by Defendants J. Kim, D. Lee, H. Lee, N. Kim, Masuda, Winkles, and Dubuc.

70. In its IPO, Webtoon sold 16,371,549 shares of common stock at a price of $21.00 per share for net proceeds of approximately $308.5 million. According to the Company, these IPO proceeds were to be used for general corporate purposes, including capital expenditures, operating expenses, and working capital.

71. Pursuant to the SEC's rules and regulations, Defendants were required to disclose in the Registration Statement all known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on Webtoon's continuing operations.

72. The Registration Statement, with respect to Webtoon's revenue and growth strategy, represented that the Company's business model was largely driven by IP adaptations and advertisements, stating:

> **Our Market Opportunity**
>
> We see a market opportunity of approximately $130 billion in Paid Content, ***$680 billion in Advertising and $900 billion in our IP Adaptations*** **businesses.**
>
> * * *
>
> ***Advertising***
>
> Our high intent, sought after user base attracts advertisers. As we continue to invest in enhanced advertising products and capabilities, ***we believe that we will be able to increase advertising revenue as we continue to innovate our advertising products and capture an increasing portion of the $680 billion digital advertising market globally.*** For example, according to our April 2024 survey of U.S. users, 80% of our users prefer to watch ads to unlock paid episodes and our users are 2x more likely to pay attention to ads compared to users on Netflix, X, Reddit and Snap.
>
> ***IP Adaptations***
>
> Including all web-comic and web-novel content but excluding Wattpad, we had approximately 725 thousand total titles on our platform as of December 31, 2023. Out of these, over 900 titles were adapted into other content formats outside of web-comic and web-novel as of March 31, 2024, representing less than 1% of our content library and demonstrating significant runway for future adaptations out of our content library.
>
> ***We believe that as our library continues to grow, and we continue to invest in the capabilities to produce IP Adaptations either in-house or with third- party partners, we can capture an increasing portion of the over $900 billion global entertainment industry.***

73. With respect to Webtoon's purported "key strengths," the Registration Statement stated, in relevant part:

> *Diversified Business Model.* We generate revenue in multiple ways. ***In the year ended December 31, 2023, 80.2% of our revenue was from Paid Content, 11.3% was from advertising and 8.4% was from IP Adaptations.***
>
> ***Even though we are in the early stage of our adaptation business and have a limited experience in generating substantial revenues from such adaptations, we believe we can further diversify our monetization strategy through IP Adaptations.***

74. With respect to Webtoon's purported "growth strategies," the Registration Statement stated, in relevant part:

> ***Accelerate the growth of our advertising business by enhancing our advertising products and reaching new advertisers.*** We plan to continue to invest in enhancing and diversifying our advertiser product offerings, including engaging and interactive advertising formats, as well as more targeted ad products leveraging the data we have. ***We have seen significant success with our advertising business in Japan and plan to accelerate the growth of our Advertising revenue in North America***. In fact, according to our April 2024 survey of U.S. users, 80% of Fast Pass users are willing to watch an ad for an episode – indicative of our opportunity to grow our Advertising revenue without detracting from the user experience. In North America, we have historically focused less on growing our advertising business and instead focused on building the core WEBTOON platform around Paid Content. ***Now that we have established a large and engaged user base in North America, we expect to capitalize on that audience, through both Wattpad and WEBTOON. We also expect to build local advertising sales teams to bring more diverse advertisers onto our platform.***

75. With respect to risks that could impact Webtoon's growth, the Registration Statement stated, in relevant part:

> ***Our growth depends on our ability to innovate and expand our advertising business and to develop effective advertising products.***
>
> We generate a portion of our revenue from advertising on our platform. ***For the three months ended March 31, 2024, our advertising revenue***

***was $37.0 million, accounting for 11.3% of our total revenue for the three months ended March 31, 2024. For the years ended December 31, 2023 and December 31, 2022, our revenue from advertising was $145.5 million and $145.1 million, respectively, accounting for 11.3% and $13.4% of our total revenue for the years ended December 31, 2023 and December 31, 2022***, respectively. Most of our advertisers do not have long-term commitments with us, and many of our advertisers can terminate their contracts with us at any time. Advertisers may not continue to do business with us, or they may reduce the budgets they are willing to commit to us, if we do not deliver advertisements in an effective manner or fail to develop effective advertising products, if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives or if they are not satisfied for any other reason. This requires us to effectively leverage digital technology and data analytics to gain new commercial insights and develop targeted marketing and advertising initiatives to reach users. If we are unable to provide advertisers with a suitable return on investment, the demand for our advertisements may not increase, or may decline, which may impact our revenue and financial results. ***In addition, our ability to generate and maintain our advertising revenues depends on a number of factors, including the maintenance and enhancement of our brands, our platform, the scale, engagement and loyalty of our users and the market competition on advertising prices***. We cannot assure you that we will be able to retain existing advertisers or attract new ones. If we are unable to retain and enhance our relationships with advertisers, our business, financial condition and results of operations could be adversely affected.

***We intend to continue to diversify our monetization strategy and increase revenues from IP Adaptations, which may not be successful.***

We currently generate a substantial majority of our revenues from Paid Content distribution. ***We also generate a portion of our revenues from online advertising.*** We plan to strengthen revenue contribution from our other monetization methods, such as monetizing content on our platform via adaptations into film, streaming series and other rich media formats. We currently have various business models for IP Adaptations, including licensing out the rights to adapt content created

> by certain creators to intellectual property adaptation partners (e.g., studios, publishers, financiers, distributors, producers and potential buyers), participating in the pre- production phase for such adaptations, co-producing or investing in production for such adaptations alongside intellectual property adaptation partners and directly funding the entire project for such adaptations. We are in the early stage of our adaptation business and have a limited track record of, or experience in, generating substantial revenues from such adaptations. ***If our adaptation initiative does not enhance our monetization ability or enable us to develop new approaches to monetization, we may not be able to substantially increase our revenues or recover any associated costs.*** In addition, we may in the future introduce new services to further diversify our revenue streams, including services with which we have little or no prior development or operating experience. ***If these new or enhanced services fail to engage users, customers or content partners, we may fail to attract or retain users or to generate sufficient revenues to justify our investments and our business and operating results may suffer as a result.***
>
> Moreover, we may fail to effectively identify and develop popular content on our platform with adaptation potential, properly maintain our existing business relationship with our intellectual property adaptation partners in the future or develop new business relationships, our intellectual property adaptation partners may be less likely to source content from and develop business cooperation with us, the occurrence of which could adversely affect our business, financial condition and results of operations.

76. With respect to other potential risks impacting Webtoon, including the risk arising from Webtoon's exposure to international currency fluctuations, the Registration Statement stated, in relevant part:

> ***Our results of operations, which are reported in U.S. dollars, could be adversely affected if currency exchange rates fluctuate substantially in the future.***
>
> As we continue to expand our international operations, we become more exposed to the effects of fluctuations in currency exchange rates. We incur expenses for employee compensation and other operating

> expenses at our non-U.S. locations in local currency. Fluctuations in the exchange rates between the U.S. dollar and other currencies could result in the dollar equivalent of our expenses being higher, which may not be offset by additional revenue earned in the local currency. This could have a negative impact on our reported results of operations. To date, we have not engaged in any hedging strategies, and any such strategies, such as forward contracts, options and foreign exchange swaps related to transaction exposures that we may implement in the future to mitigate this risk may not eliminate our exposure to foreign exchange fluctuations. Moreover, the use of hedging instruments may introduce additional risks if we are unable to structure effective hedges with such instruments.
>
> * * *
>
> **Quantitative and Qualitative Disclosures about Market Risk**
>
> We are exposed to market risks in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily the result of foreign currency exchange rates and fluctuations in interest rates.
>
> ***Foreign Currency Exchange Risk***
>
> Our revenue is generated globally in multiple currencies, primarily the Korean won, Japanese yen and U.S. dollar. Our results of current and future operations and cash flows are therefore subject to fluctuations due to changes in foreign currency exchange rates. As the impact of foreign currency exchange rates has not been material to our historical operating results, we have not entered into derivative or hedging transactions, but we may do so in the future if our exposure to foreign currency becomes more significant.

77. The Registration Statement also reported Webtoon's financial results, stating, in relevant part:

> For the year ended December 31, 2023, we generated revenue of $1,282.7 million, net loss of $144.8 million and Adjusted EBITDA of $11.7 million, representing a net loss margin of (11.3)% and an Adjusted EBITDA Margin of 0.9%. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures."

78. The statements referenced above were materially false and misleading when made because they failed to disclose material adverse facts about Webtoon's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) Webtoon had undergone a deceleration in advertising revenue growth; (2) Webtoon had undergone a deceleration in IP adaptations revenue; and (3) Webtoon faced exposure to weaker foreign currencies which offset revenue growth. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Emerges***

79. On August 8, 2024, the truth emerged when, after the market closed, Webtoon disclosed its financial results for the second quarter of 2024, which had ended just days after the closing of the IPO. Webtoon disclosed revenue of $321 million, representing total revenue growth of only 0.1%, and reported a quarterly net loss of $76.6 million, or 70 cents. The press release stated, in relevant part:

> WEBTOON's total revenue for the three months ended June 30, 2024 increased 0.1% to $321.0 million compared to $320.7 million in the prior year as growth across the business was offset by the Company's significant exposure to weaker foreign currencies including the Korean won and Japanese yen, the latter of which reached historically low levels against the U.S. dollar.
>
> On a constant currency basis, this translated to robust double digit revenue growth of 11.1%, with growth drivers across all revenue streams globally.
>
> In Paid Content, revenue of $260.7 million grew 1.0%, or 11.5% on a constant currency basis. This was driven by robust, double digit revenue growth on a constant currency basis in Rest of World as well as Japan, which is the Company's largest market, following successful execution of user conversion strategies. During the second quarter, total MAUs of 166.3 million and MPUs of 7.8 million remained

relatively stable compared to the prior year. The Company also strengthened its leadership position in Japan, with MPUs growing 15.5% compared to the second quarter of 2023, supporting a record high MPU and Paying Ratio. In Korea, user engagement metrics showed improvement towards the end of the quarter following the initial roll out of the platform's AI-driven personalized recommendation model.

Advertising revenue was down 3.6%, which translated to growth of 2.3% on a constant currency basis. Triple digit revenue growth on a constant currency basis in Japan and double digit revenue growth on a constant currency basis in Rest of World amidst the ongoing capture of a relatively nascent North American market were partially offset by declining ad revenue in Korea, primarily due to the continued strategic diversification of advertising partners and inventory away from parent company, NAVER Corporation. The Company continues to diversify its advertising products and the introduction of pre-roll ads has bolstered performance.

IP Adaptations revenue declined 3.7%, which translated to growth of 24.9% on a constant currency basis, driven by growth in all geographies. The Company remains focused on efforts to strengthen its flywheel through IP adaptations, which support expansion of our user base, enhance the creator ecosystem, and contribute to the overall growth of the platform.

80. On this news, Webtoon's stock price fell $7.88 per share, or 38.2%, from a closing price of $20.63 per share on August 8, 2024 to close at a price of $12.75 per share on August 9, 2024.

## DAMAGES TO WEBTOON

81. As a direct and proximate result of the Individual Defendants' conduct, Webtoon has lost and will continue to lose and expend many millions of dollars.

82. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

83. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

84. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

85. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

86. As a direct and proximate result of the Individual Defendants' conduct, Webtoon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE AND DEMAND REFSUAL ALLEGATIONS

87. Plaintiff brings this action derivatively in the right and for the benefit of Webtoon to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Webtoon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of federal law.

88. Webtoon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89. Plaintiff is, and has been at all relevant times, a continuous shareholder of Webtoon and understands the obligation to hold stock throughout the duration of this action and is prepared to do so.

90. Plaintiff will adequately and fairly represent the interests of Webtoon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

91. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

92. The Individual Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

93. On December 11, 2024, Plaintiff, through Plaintiff's counsel, served the Demand on Webtoon's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by permitting Webtoon to issue the improper statements set forth herein. *See* Exhibit A. The Demand outlined the same alleged misstatements made during the Relevant Period that are detailed herein.

94. On January 14, 2025, Plaintiff, through Plaintiff's counsel, followed up with the Company concerning the status of the Board's consideration of the demand.

95. On January 24, 2025, counsel for the Board responded to Plaintiff's Demand (the "Refusal Letter"). The Board acknowledged that it had "met to discuss the Demand" but declined to take any of the action Plaintiff had requested. *See* Exhibit B. Instead, the Board had determined to "defer a decision on whether to conduct the demanded investigation or to initiate litigation while the Securities

Class Action and Derivative Action develop and the Board monitors such development." *Id.*

96. Because the Board intentionally suspended both investigation and substantive consideration of the Demand for an indefinite period, it has constructively refused the Demand.

97. Critically, the Refusal Letter contains no substantive evaluation of the Demand itself. The Board made no findings concerning the alleged misconduct, expressed no view regarding the merits of Plaintiff's allegations beyond their relationship to the pending litigation, and did not conclude that litigation would or would not be in the Company's best interests. Instead, the Board merely announced that it would defer consideration. The absence of any investigative record is particularly significant because, in evaluating whether a board's response (or lack thereof) to a demand is protected by the business judgment rule, Delaware courts examine whether the board undertook an informed process in good faith.

98. The Board's constructive refusal of Plaintiff's Demand was wrongful and is not entitled to the protection of the business judgment rule because the Board did not undertake a reasonable, good-faith investigation of the matters presented in the Demand and has failed to demonstrate that its continued refusal to act is the product of a reasoned exercise of business judgment.

99. The Board identified no timetable for completing its consideration of the Demand, no specific event that would trigger further consideration, no deadline by which the Board would determine whether to pursue the alleged misconduct identified by Plaintiff, and no concrete action that Board intended to take to preserve and prosecute claims on Webtoon's behalf as a result of the alleged misconduct.

100. The Board's decision to postpone consideration of the Demand constitutes a constructive refusal. Unlike in cases in which courts have deferred to boards that were actively investigating shareholder demands, the Refusal Letter

reflects that no investigation was undertaken. By conditioning any investigation or exercise of business judgment on the completion of complex federal securities litigation, the Board elected not to act within a reasonable period of time. A board cannot indefinitely suspend its obligation to evaluate a shareholder demand merely because related litigation remains pending. Courts recognize that overlapping litigation may justify delaying an investigation for a limited period of time, but those cases contemplate a board that is actively exercising its business judgement, not one that affirmatively resolves to defer both investigation and substantive consideration until an uncertain future date.

101. Here, the Board emphasized that, as of the date of the Refusal Letter, the Securities Class Action and Derivative Action were "both in their infancy" and that "no responsive pleading or motions to dismiss [had] even been filed." Thus, by the Board's own account, its decision to defer consideration of the Demand was based on the preliminary procedural posture of the related litigation at that point in time. Even assuming that a temporary deferral may have constituted a permissible exercise of business judgment when the Board responded in January 2025, the reasonableness of that decision necessarily depended upon the Board continuing to monitor the circumstances underlying the deferral and reconsidering the Demand as those circumstances evolved.

102. Indeed, the Board expressly represented that it would "continue to monitor the pending litigation" and would "consider the Demand at a later point in time, as circumstances warrant, and may take or decline to take any of the demanded actions or other actions in the future, if warranted in light of future developments."

103. Since the Rejection Letter, there have been significant developments in the Securities Class Action, including the denial of defendants motion to dismiss in part. Still, the Board has not commenced litigation against any of the directors or officers identified in the Demand, has not otherwise implemented the relief sought

by Plaintiff, and has not advised Plaintiff that it intends to form an investigation committee or take further action. In fact, the Board has not provided Plaintiff with any subsequent decision concerning the Demand. Despite representing that it would continue to monitor developments and reconsider the Demand when circumstances warranted, the Board has allowed the Demand to remain unresolved indefinitely while taking no action to obtain relief for Webtoon from the Individual Defendants' misconduct.

104. Courts routinely recognize that the business judgment rule does not protect directors who consciously failed to act upon a shareholder demand. The Board has forestalled immediate litigation by Plaintiff while reserving for itself the ability to postpone any substantive consideration until the conclusion of separate litigation. Such an indefinite deferral does not constitute a good-faith exercise of business judgment regarding the Demand, but instead confirms that the Board elected to delay reckoning with the Demand rather than discharge its fiduciary obligations in response to it.

105. The Board cannot avoid the consequences of refusing a stockholder demand merely by declining to use the word "refuse." A purported deferral cannot operate as an indefinite suspension of the Company's claims or of Plaintiff's ability to redress derivatively on the Company's behalf. The Board has been provided with ample opportunity to investigate and pursue the claims belonging to Webtoon and has refused to do so.

106. The Board's prolonged silence is incompatible with its assertion that the Demand remained under consideration. A reasoned decision to temporarily defer action requires, at minimum, that the Board actually revisit that decision as the circumstances purportedly justifying the deferral. The Board has not done so.

107. At the time the Board refused the Demand, the Board consisted of the Individual Defendants.

108. For the foregoing reasons, the Board therefore did not exercise its business judgment independently, reasonably, or in good faith upon all reasonably available information. Because the Board has neither conducted nor undertaken any present evaluation of the Demand within a reasonable time, its indefinite deferral constitutes a constructive refusal, and Plaintiff is entitled to proceed derivatively on behalf of Webtoon.

## CLAIMS FOR RELIEF

## COUNT I

***Against the Individual Defendants for Breach of Fiduciary Duties***

109. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Webtoon's business and affairs.

111. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

112. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Webtoon.

113. In breach of their fiduciary duties owed to Webtoon, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, inter alia, that: (1) Webtoon had undergone a deceleration in advertising revenue growth; (2) Webtoon had undergone a deceleration in IP adaptations revenue; and (3) Webtoon faced exposure to weaker foreign currencies which offset revenue growth. As a result of the foregoing, the Company's public statements were

materially false and misleading and/or lacked a reasonable basis at all relevant times.

114. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

115. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

116. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Webtoon's securities.

117. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Webtoon's securities. The Individual Defendants, in good

faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

118. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

119. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Webtoon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

120. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## COUNT II

***Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty***

121. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In doing so, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the illegal conduct complained of herein.

123. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## COUNT III

***Against the Individual Defendants for Unjust Enrichment***

124. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made,

the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Webtoon.

126. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Webtoon that was tied to the performance or artificially inflated valuation of Webtoon, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

127. Plaintiff, as a shareholder and a representative of Webtoon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

128. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## **COUNT IV**

***Against the Individual Defendants for Abuse of Control***

129. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Webtoon, for which they are legally responsible.

131. As a direct and proximate result of the Individual Defendants' abuse of control, Webtoon has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

132. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

**COUNT V**

***Against the Individual Defendants for Gross Mismanagement***

133. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Webtoon in a manner consistent with the operations of a publicly held corporation.

135. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Webtoon has sustained and will continue to sustain significant damages.

136. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

137. Plaintiff, on behalf of Webtoon, has no adequate remedy at law/

**COUNT VI**

***Against the Individual Defendants for Waste of Corporate Assets***

138. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

140. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Webtoon to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

141. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

142. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## COUNT VII

***Against the Individual Defendants for Contribution Under Sections 11(f) of the Securities Act and 21D of the Exchange Act***

143. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144. As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Webtoon shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

145. Federal law provides Webtoon with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

146. The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Company's IPO contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts.

147. Webtoon is the registrant for the IPO. The Individual Defendants were responsible for the contents and dissemination of the Registration Statement.

148. As issuer of the shares, Webtoon is strictly liable to the class action plaintiff and the class for the misstatements and omissions.

149. The plaintiffs in the Securities Class Action allege that none of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

150. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Webtoon, were able to and did, directly

and/or indirectly, exercise control over the business and corporate affairs of Webtoon, including the wrongful acts complained of herein and in the Securities Class Action.

151. Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

152. As such, Webtoon is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

153. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Webtoon, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Webtoon;

(c) Determining and awarding to Webtoon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Webtoon and the Individual Defendants to take all necessary actions to reform and improve Webtoon's corporate governance and internal procedures to comply with applicable laws and to protect Webtoon and its shareholders from a repeat of the damaging events described herein;

(e) Awarding Webtoon restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 21, 2026

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Yun Lu*

VERIFICATION

I, Yun Lu, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

Dated: 8/21/2026

Signed by:

502C96A71D514C7...

Yun Lu

# EXHIBIT A

The Rosen Law Firm
INVESTOR COUNSEL

December 11, 2024

Phillip Kim
philkim@rosenlegal.com

**VIA FEDEX**

Board of Directors
c/o Junkoo Kim, Chairman of the Board
WEBTOON Entertainment Inc.
5700 Wilshire Blvd, Suite 220
Los Angeles, CA 90036

**Re: Shareholder Demand on WEBTOON Entertainment Inc.'s Board of Directors**

Dear Directors of the Board:

We write on behalf of Yun Lu (the "Stockholder"), who owns shares of WEBTOON Entertainment Inc. ("Webtoon" or the "Company") and has continued to hold them at all relevant times.

As set forth more fully below, this letter serves as the Stockholder's demand that the Company's Board of Directors (the "Board") take legal action for the breaches of fiduciary duty in connection with the allegations herein against, at least, Junkoo Kim, David J. Lee, Nancy Dubuc, Namsun Kim, Haejin Lee, Jun Masuda, and Isabelle Winkles (collectively, the "Officers and Directors") and any other individuals or entities that engaged in wrongdoing from June 27, 2024 through August 8, 2024.

By reason of their positions as officers and/or directors of Webtoon, and because of their ability to control its business and corporate affairs, the Officers and Directors owed and owe Webtoon and the Company's shareholders fiduciary obligations of good faith, loyalty, and due care. They were and are required to use their utmost ability to control and manage Webtoon in a fair, just, and honest manner and in compliance with all applicable federal, state, and local laws, rules, and regulations. Similarly, they were and are required to remain informed as to how the Company conducts its business and corporate affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiries in connection therewith, and take steps necessary to correct such conditions, policies, or practices, and make such public disclosures as necessary to comply with all applicable laws.

The Shareholder believes that the Officers and Directors of Webtoon violated these

fiduciary duties and/or aided and abetted such breaches of fiduciary duties and were unjustly enriched to the detriment of the Company.

## I. FACTUAL BACKGROUND

As you know, Webtoon is a Delaware corporation founded in 2005 by Junkoo Kim and represents itself to be "a global storytelling platform where a vibrant community of creators and users discover, create and share new content." The Company focuses on, *inter alia,* mobile webcomics and visual storytelling. Webtoon is a majority-owned subsidiary of the South Korean internet conglomerate, NAVER Corporation.

On May 31, 2024, Webtoon filed its registration statement on Form S-1 with the U.S. Securities and Exchange Commission ("SEC"). On June 17, 2024, Webtoon filed its final amendment to the registration statement with the SEC on Form S-1/A. On June 18, 2024, the registration statement was declared effective. Subsequently, on June 27, 2024, Webtoon filed its Prospectus with the SEC. Together, the Form S-1, Form S-1/A, and Prospectus form the "Registration Statement." The Registration Statement was signed by Junkoo Kim, David Lee, Haejin Lee, Namsun Kim, Jun Masuda, Isabelle Winkles, and Nancy Dubuc.

Pursuant to the SEC's rules and regulations, all known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on Webtoon's continuing operations were required to be disclosed in the Registration Statement.

In its IPO, Webtoon sold 16,371,549 shares of common stock at a price of $21.00 per share for net proceeds of approximately $308.5 million. Purportedly, these IPO proceeds were to be used for general corporate purposes, including capital expenditures, operating expenses, and working capital.

* * *

The Registration Statement represented, with respect to Webtoon's revenue and growth strategy, that the Company's business model was largely driven by IP adaptations and advertisements, stating:

> **Our Market Opportunity**
>
> We see a market opportunity of approximately $130 billion in Paid Content, ***$680 billion in Advertising and $900 billion in our IP Adaptations*** **businesses.**
>
> * * *
>
> ***Advertising***
>
> Our high intent, sought after user base attracts advertisers. As we continue to invest in enhanced advertising products and capabilities, ***we believe that we will be able to increase advertising revenue as we continue to innovate our advertising products and capture an increasing portion of the $680 billion digital advertising market globally.*** For example, according to our April 2024 survey of U.S. users,

80% of our users prefer to watch ads to unlock paid episodes and our users are 2x more likely to pay attention to ads compared to users on Netflix, X, Reddit and Snap.

***IP Adaptations***

Including all web-comic and web-novel content but excluding Wattpad, we had approximately 725 thousand total titles on our platform as of December 31, 2023. Out of these, over 900 titles were adapted into other content formats outside of web-comic and web-novel as of March 31, 2024, representing less than 1% of our content library and demonstrating significant runway for future adaptations out of our content library.

***We believe that as our library continues to grow, and we continue to invest in the capabilities to produce IP Adaptations either in-house or with third- party partners, we can capture an increasing portion of the over $900 billion global entertainment industry.***

With respect to Webtoon's purported "key strengths," the Registration Statement stated, in relevant part:

***Diversified Business Model.*** We generate revenue in multiple ways. ***In the year ended December 31, 2023, 80.2% of our revenue was from Paid Content, 11.3% was from advertising and 8.4% was from IP Adaptations.***

***Even though we are in the early stage of our adaptation business and have a limited experience in generating substantial revenues from such adaptations, we believe we can further diversify our monetization strategy through IP Adaptations.***

The Registration Statement further stated, with respect to Webtoon's purported "growth strategies," in relevant part:

***Accelerate the growth of our advertising business by enhancing our advertising products and reaching new advertisers.*** We plan to continue to invest in enhancing and diversifying our advertiser product offerings, including engaging and interactive advertising formats, as well as more targeted ad products leveraging the data we have. ***We have seen significant success with our advertising business in Japan and plan to accelerate the growth of our Advertising revenue in North America***. In fact, according to our April 2024 survey of U.S. users, 80% of Fast Pass users are willing to watch an ad for an episode – indicative of our opportunity to grow our Advertising revenue without detracting from the user experience. In North America, we have historically focused less on growing our advertising business and instead focused on building the core WEBTOON platform around Paid Content. ***Now that we have established a large and engaged user base in North America, we expect to capitalize on that audience, through both Wattpad***

***and WEBTOON. We also expect to build local advertising sales teams to bring more diverse advertisers onto our platform.***

Regarding risk that could impact Webtoon's growth, the Registration Statement stated, in relevant part:

> ***Our growth depends on our ability to innovate and expand our advertising business and to develop effective advertising products.***
>
> We generate a portion of our revenue from advertising on our platform. ***For the three months ended March 31, 2024, our advertising revenue was $37.0 million, accounting for 11.3% of our total revenue for the three months ended March 31, 2024. For the years ended December 31, 2023 and December 31, 2022, our revenue from advertising was $145.5 million and $145.1 million, respectively, accounting for 11.3% and $13.4% of our total revenue for the years ended December 31, 2023 and December 31, 2022***, respectively. Most of our advertisers do not have long-term commitments with us, and many of our advertisers can terminate their contracts with us at any time. Advertisers may not continue to do business with us, or they may reduce the budgets they are willing to commit to us, if we do not deliver advertisements in an effective manner or fail to develop effective advertising products, if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives or if they are not satisfied for any other reason. This requires us to effectively leverage digital technology and data analytics to gain new commercial insights and develop targeted marketing and advertising initiatives to reach users. If we are unable to provide advertisers with a suitable return on investment, the demand for our advertisements may not increase, or may decline, which may impact our revenue and financial results. ***In addition, our ability to generate and maintain our advertising revenues depends on a number of factors, including the maintenance and enhancement of our brands, our platform, the scale, engagement and loyalty of our users and the market competition on advertising prices***. We cannot assure you that we will be able to retain existing advertisers or attract new ones. If we are unable to retain and enhance our relationships with advertisers, our business, financial condition and results of operations could be adversely affected.
>
> ***We intend to continue to diversify our monetization strategy and increase revenues from IP Adaptations, which may not be successful.***
>
> We currently generate a substantial majority of our revenues from Paid Content distribution. ***We also generate a portion of our revenues from online advertising.*** We plan to strengthen revenue contribution from our other monetization methods, such as monetizing content on our platform via adaptations into film, streaming series and other rich media formats. We currently have various business models for IP Adaptations, including licensing out the rights to adapt content created by certain creators to intellectual property adaptation partners (e.g., studios, publishers,

> financiers, distributors, producers and potential buyers), participating in the pre-production phase for such adaptations, co-producing or investing in production for such adaptations alongside intellectual property adaptation partners and directly funding the entire project for such adaptations. We are in the early stage of our adaptation business and have a limited track record of, or experience in, generating substantial revenues from such adaptations. ***If our adaptation initiative does not enhance our monetization ability or enable us to develop new approaches to monetization, we may not be able to substantially increase our revenues or recover any associated costs.*** In addition, we may in the future introduce new services to further diversify our revenue streams, including services with which we have little or no prior development or operating experience. ***If these new or enhanced services fail to engage users, customers or content partners, we may fail to attract or retain users or to generate sufficient revenues to justify our investments and our business and operating results may suffer as a result.***
>
> Moreover, we may fail to effectively identify and develop popular content on our platform with adaptation potential, properly maintain our existing business relationship with our intellectual property adaptation partners in the future or develop new business relationships, our intellectual property adaptation partners may be less likely to source content from and develop business cooperation with us, the occurrence of which could adversely affect our business, financial condition and results of operation.

Other potential risks that could impact Webtoon were also addressed, including the risk arising from Webtoon's exposure to international currency fluctuations. The Registration Statement stated, in relevant part:

> ***Our results of operations, which are reported in U.S. dollars, could be adversely affected if currency exchange rates fluctuate substantially in the future.***
>
> As we continue to expand our international operations, we become more exposed to the effects of fluctuations in currency exchange rates. We incur expenses for employee compensation and other operating expenses at our non-U.S. locations in local currency. Fluctuations in the exchange rates between the U.S. dollar and other currencies could result in the dollar equivalent of our expenses being higher, which may not be offset by additional revenue earned in the local currency. This could have a negative impact on our reported results of operations. To date, we have not engaged in any hedging strategies, and any such strategies, such as forward contracts, options and foreign exchange swaps related to transaction exposures that we may implement in the future to mitigate this risk may not eliminate our exposure to foreign exchange fluctuations. Moreover, the use of hedging instruments may introduce additional risks if we are unable to structure effective hedges with such instruments.

* * *

> ***Quantitative and Qualitative Disclosures about Market Risk***
>
> We are exposed to market risks in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily the result of foreign currency exchange rates and fluctuations in interest rates.
>
> ***Foreign Currency Exchange Risk***
>
> Our revenue is generated globally in multiple currencies, primarily the Korean won, Japanese yen and U.S. dollar. Our results of current and future operations and cash flows are therefore subject to fluctuations due to changes in foreign currency exchange rates. As the impact of foreign currency exchange rates has not been material to our historical operating results, we have not entered into derivative or hedging transactions, but we may do so in the future if our exposure to foreign currency becomes more significant.

The Registration Statement also reported Webtoon's financial results, stating, in relevant part:

> For the year ended December 31, 2023, we generated revenue of $1,282.7 million, net loss of $144.8 million and Adjusted EBITDA of $11.7 million, representing a net loss margin of (11.3)% and an Adjusted EBITDA Margin of 0.9%. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non- GAAP Financial Measures."

Then, after the market closed on August 2024, Webtoon issued a press release disclosing its financial results for the second quarter of 2024, which had ended just days after the closing of the IPO. Webtoon disclosed revenue of $321 million, representing total revenue growth of only 0.1% and reported a quarterly loss of $76.6 million. In addition, Webtoon disclosed advertising revenue declined 3.6% and IP adaptations revenue declined 3.7%. The Company stated that its revenue and revenue growth had been "offset by the Company's significant exposure to weaker foreign currencies." The press release stated, in relevant part:

> WEBTOON's total revenue for the three months ended June 30, 2024 increased 0.1% to $321.0 million compared to $320.7 million in the prior year as growth across the business was offset by the Company's significant exposure to weaker foreign currencies including the Korean won and Japanese yen, the latter of which reached historically low levels against the U.S. dollar.
>
> On a constant currency basis, this translated to robust double digit revenue growth of 11.1%, with growth drivers across all revenue streams globally.
>
> In Paid Content, revenue of $260.7 million grew 1.0%, or 11.5% on a constant currency basis. This was driven by robust, double digit revenue growth on a

> constant currency basis in Rest of World as well as Japan, which is the Company's largest market, following successful execution of user conversion strategies. During the second quarter, total MAUs of 166.3 million and MPUs of 7.8 million remained relatively stable compared to the prior year. The Company also strengthened its leadership position in Japan, with MPUs growing 15.5% compared to the second quarter of 2023, supporting a record high MPU and Paying Ratio. In Korea, user engagement metrics showed improvement towards the end of the quarter following the initial roll out of the platform's AI-driven personalized recommendation model.
>
> Advertising revenue was down 3.6%, which translated to growth of 2.3% on a constant currency basis. Triple digit revenue growth on a constant currency basis in Japan and double digit revenue growth on a constant currency basis in Rest of World amidst the ongoing capture of a relatively nascent North American market were partially offset by declining ad revenue in Korea, primarily due to the continued strategic diversification of advertising partners and inventory away from parent company, NAVER Corporation. The Company continues to diversify its advertising products and the introduction of pre-roll ads has bolstered performance.
>
> IP Adaptations revenue declined 3.7%, which translated to growth of 24.9% on a constant currency basis, driven by growth in all geographies. The Company remains focused on efforts to strengthen its flywheel through IP adaptations, which support expansion of our user base, enhance the creator ecosystem, and contribute to the overall growth of the platform.

On this news, Webtoon's stock price fell $7.88 per share, or 38.2%, from a closing price of $20.62 per share on August 8, 2024, to a closing price of $12.75 per share on August 9, 2024.

As a result of the misconduct described above, Webtoon has been subjected to lawsuits, including: (i) a federal securities fraud class action lawsuit brought against Webtoon, its Chief Executive Officers, its Chief Financial Officer and Chief Operating Officer, and all of its directors, captioned *Brookman v. WEBTOON Entertainment Inc. et al*, Case No. 2:24-cv-07553-CBM (C.D. Cal.); and (ii) a derivative action filed on behalf of Webtoon against the Company's Officers and Directors, captioned *Cheung v. Kim et al*, Case No. 2:24-cv-09915-CBM (C.D. Cal.).

* * *

The breaches of fiduciary duties committed by the Officers and Directors are numerous and include, but are not limited to:

*Issuing False and Misleading Statements.* The Officers and Directors knowingly or recklessly disseminated materially false and misleading statements in Webtoon's Registration Statement regarding the Company's business, operations, and prospects. Specifically, the Officers and Defendants failed to disclose that: (1) Webtoon had undergone a deceleration in advertising revenue growth; (2) Webtoon had undergone a deceleration in IP adaptations revenue; and (3)

Webtoon faced exposure to weaker foreign currencies which offset revenue growth.

*Unjust Enrichment/Excessive Compensation.* The Officers and Directors have been unjustly enriched as a result of receiving bonuses, stock options, or similar compensation from the Company in light of their misconduct. For instance, in the 2023 fiscal year, J. Kim received $10,345,557 and D. Lee received $5,436,004. Moreover, the Officers and Directors received restricted stock units ("RSUs") and/or stock options, contingent upon the closing of the IPO, which would not have closed but for the false and misleading Registration Statement.

*Failure to Implement and Maintain Adequate Internal Controls.* In further breach of their fiduciary duties, the Officers and Directors caused the Company to fail to maintain adequate internal controls. Contrary to the Registration Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements. Thus, in addition to engaging in the wrongful acts detailed herein, the Officers and Directors chose not to implement and/or maintain policies and procedures adequate and necessary to correct the false and misleading statements that had been issued and to prevent similar actions from occurring in the future.

* * *

*Damages*. The Company has been substantially damaged as a result of the Officers and Directors' breaches of fiduciary duty and other misconduct. As a direct and proximate result of the misconduct described herein, Webtoon has lost and expended, and will continue to lose and expend, many millions of dollars. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action and Derivative Action pending in the United States District Court for the Central District of California, liability in such lawsuits, amounts paid to outside lawyers, accountants, and investigators in connection with any such lawsuits, and any settlement payments that may result. Additionally, these expenditures include, but are not limited to, the unjust compensation and benefits paid to the Officers and Director and the waste of corporate assets. Webtoon has further suffered and will continue to suffer a loss of reputation and goodwill as a result of the misconduct, and a "liar's discount" that will plague the Company's stock in the future.

## II. DEMAND

Demand is hereby made that the Board investigate whether any of Webtoon's officers and directors committed non-exculpable breaches of fiduciary duty and/or other violations of applicable law in connection with the allegations detailed herein. We urge the Board to conduct an independent and disinterested investigation of the allegations detailed herein as is required under Delaware law.

Further, the Stockholder demands that the Board commence a civil action against each responsible individual and entity and each responsible affiliate of Webtoon, including, at least, the Officers and Directors, to recover for the benefit of the Company. The Company must recover from the aforementioned individuals the amount of damages sustained by the Company as a result

of their breaches of fiduciary duties. The Board must also assess whether any third parties should be sued, such as Webtoon's financial advisors, auditors, underwriters, or attorneys. Webtoon must also adopt corporate governance improvements immediately.

* * *

Please confirm receipt of this letter and the measures that the Board plans to take to address the harm inflicted upon Webtoon as a result of the conduct described herein. If, after receiving this letter, the Board has not commenced an action as demanded within a reasonable period, we intend to initiate litigation on behalf of the Company. We are willing to assist the Board as it is conducting the investigation and will review and comment upon all reports and information generated in the course of its work.

With any questions, please do not hesitate to contact the undersigned counsel. Thank you for your attention to these matters.

Very truly yours,

Phillip Kim

________________

Phillip Kim



THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10116 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202-3827

# EXHIBIT B

KIRKLAND & ELLIS LLP

Stefan Atkinson, P.C.
To Call Writer Directly:
+1 212 446 4803
stefan.atkinson@kirkland.com

601 Lexington Avenue
New York, NY 10022
United States

+1 212 446 4800

www.kirkland.com

Facsimile:
+1 212 446 4900

January 24, 2025

**Via Fedex and Email**

Phillip Kim, Esq.
philkim@rosenlegal.com
The Rosen Law Firm, P.A.
275 Madison Avenue, 40th Floor
New York, NY 10116

Re: Shareholder Demand on WEBTOON Entertainment Inc.'s Board of Directors

Dear Mr. Kim:

I write on behalf of the Board of Directors (the "Board") of WEBTOON Entertainment Inc. ("WEBTOON" or the "Company"), in response to your December 11, 2024 letter (the "Demand") written on behalf of Yun Lu, who you claim is an owner of shares of the Company's common stock (the "Stockholder"). Your letter demands that the Board investigate and commence proceedings against the Company's directors and officers related to alleged breaches of their duties to the Company based on their allegedly disseminating materially false and misleading statements in the Company's IPO registration statement.

The Board has met to discuss the Demand. The Board reviewed and considered the Demand as well as additional information relevant to choosing the course of action that is in the Company's best interests. Among other things, the Board considered the existence of the pending securities litigation and shareholder derivative litigation, which are based on alleged statements, omissions, and conduct that are substantially similar to those described in the Demand. *See Brookman v. WEBTOON Entertainment Inc.*, No. 2:24-cv-07553-CBM-RAO (C.D. Cal.) (Sept. 5, 2024) (the "Securities Action"); *Cheung v. Kim,* No. 2:24-cv-09915-CBM-RAO (C.D. Cal.) (Nov. 15, 2024) (the "Derivative Action").

The pendency of the Securities Action and Derivative Action and their significant overlap with the allegations in the Demand counsel in favor of deferring a decision on whether to conduct the requested investigation and commence any litigation. As you know, consistent with its fiduciary duties, the Board must carefully balance any value of commencing an internal investigation and litigation with the economic, legal, and strategic risks of undertaking such action, including the risks relating to the Company's ongoing defense of the pending Securities Action. The Board's decision in responding to a Demand must be aimed at mitigating such risks in keeping

KIRKLAND & ELLIS LLP



with the best interests of the Company. *See In re Kraft Heinz Demand Refused Derivative S'holder Litig.*, No. 2022-0398-LWW, 2024 WL 3493957, at *16 (Del. Ch. July 19, 2024) ("It is within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation or harm its long-term strategic interests." (citing *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007))); *Feuer v. Zuckerberg*, No. CV 2018-0307-JRS, 2021 WL 4552160 at *5 n.37 (Del. Ch. Oct. 5, 2021) ("[T]he board's decision will be protected unless it was 'wrongful,' *i.e.*, unless it was not the product of a valid exercise of business judgment.").

More specifically, in the Securities Action, in which the Company is a defendant, the Company intends to defend itself against the plaintiff's claims. Conducting an investigation and commencing litigation regarding conduct that is substantially similar to that alleged in the Securities Action has the potential to undermine the Company's ability to successfully defend itself in the Securities Action—whether on a motion to dismiss, in discovery, at summary judgment, or at trial—and thus harm the Company. *See South v. Baker*, 62 A.3d 1, 25 (Del. Ch. 2012) (pursuing a related claim "during the pendency of the underlying litigation or governmental investigation may well compromise the corporation's position on the merits, thereby causing or exacerbating precisely the harm that the . . . plaintiff ostensibly seeks to remedy").

Furthermore, the outcome of the Securities Action and the Derivative Action may inform an ultimate decision as to whether it is in the Company's best interests to pursue the actions urged by the Demand. For example, if the court in the Securities Action finds that the Company's IPO registration statement does not contain a material misstatement or omission, then it would be wasteful and unnecessary for the Board to conduct an investigation regarding that same issue. As another example, if the Board were to conduct the requested investigation and later the court in the Derivative Action determined that the Board was "unable to impartially investigate the charges" (Derivative Action Compl. ¶ 96), then the Company would have wasted resources in conducting the investigation that the Stockholder now demands.[1] *See, e.g.*, *Witmer on Behalf of Banc of California,, Inc. v. Sugarman*, No. SACV 18-00246-CJC-DFMX, 2018 WL 4846917, at *5 (C.D. Cal. Aug. 23, 2018) ("courts have held that resolution of related derivative litigation justifies deferring consideration of a shareholder demand" (citing *Lowinger v. Oberhelman*, No. 15-CV-01109-SLD-JEH, 2017 WL 1224524, at *5–6 (C.D. Ill. Mar. 31, 2017), *aff'd*, 924 F.3d 360 (7th Cir. 2019); *Piven v. Ryan*, No. 05 CV 4619, 2006 WL 756043, at *4 (N.D. Ill. Mar. 23,

[1] To be clear, the Board is disinterested and independent, as the Stockholder conceded by making the Demand. *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74 (Del. 1997), *as modified on denial of reh'g* (Oct. 22, 1997), and *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Rales v. Blasband*, 634 A.2d 927, 936 n.12 (Del. 1993).

2006); *Maccoumber v. Austin*, No. 03 C 9405, 2004 WL 1745751, at *5–6 (N.D. Ill. Aug. 2, 2004))).

Moreover, the Demand alleges that the Company has been harmed by the legal fees and costs associated with litigating the Securities Action and Derivative Action. Of course, if the Company successfully defends the Securities Action, then the allegations in the Derivative Action and the Demand will fall too, as they rest solely on the allegations in the Securities Action. But even setting aside the merits of the allegations, it would be premature to determine to investigate the scope of any potential harm to the Company while those lawsuits are ongoing.

Finally, we note that the Securities Action and the related Derivative Action are both in their infancy, and no responsive pleading or motions to dismiss have even been filed. The Demand provides no evidence that its allegations—or the overlapping allegations in the Securities Action and the Derivative Action—have any merit.

* * *

Upon due consideration of relevant information, including but not limited to the considerations described above, the Board has determined, in an exercise of its considered business judgment, that it is in the Company's best interest to defer a decision on whether to conduct the demanded investigation or to initiate litigation while the Securities Action and Derivative Action develop and the Board monitors such development. *See, e.g.*, *Pettry on behalf of FedEx Corp. v. Smith*, No. CV 2019-0795-JRS, 2021 WL 2644475, at *8 n.91 (Del. Ch. June 28, 2021), *aff'd*, 273 A.3d 750 (Del. 2022) (finding that monitoring a related pending litigation and deferring a decision on a demand until its conclusion is a valid exercise of business judgment); *Lowinger*, 2017 WL 1224524, at *5–6 (applying Delaware law to conclude that the board's decision to defer the demanded investigation to conserve resources in light of pending litigation was protected by the business judgment rule).

To be clear, the Board is not rejecting or refusing the Demand. The Board will continue to monitor the pending litigation as well as take any other action it determines to be necessary or appropriate to safeguard the rights and interests of the Company. The Board will consider the Demand at a later point in time, as circumstances warrant, and may take or decline to take any of the demanded actions or other actions in the future, if warranted in light of future developments.

Meanwhile, we ask that you provide proof of Yun Lu's ownership of WEBTOON common stock during the relevant time period, including through the present. *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 935 (Del. Ch. 2008) (taking 8 Del. C. § 327 and Del. Ch. Ct. R. 23.1 together to require satisfaction of two tests: "1) the contemporaneous ownership test, which requires stockholders to have owned stock at the time of the wrong complained of, and

KIRKLAND & ELLIS LLP



2) the continuous ownership rule requiring stockholders to maintain their shareholder status throughout the litigation.”).

Regards,

Stefan Atkinson, P.C.